## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**CHAKRABARTI, et al.**

                    Plaintiffs,

v.

**USCIS, et al.**

                    Defendants

Civil Action No.:  8:21-cv-01945-PJM

---

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF A MOTION FOR A PRELIMINARY INJUNCTION

---

JEFF D. JOSEPH
District of MD Bar ID: : 22325
Atty. Reg. No. (Colorado) 28695
Joseph & Hall P.C.
12203 East Second Avenue
Aurora, CO 80011
(303) 297-9171
jeff@immigrationissues.com

i

## TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II.  BACKGROUND .................................................................................................2

    A.  Statutory and Regulatory Background ................................................... 2

    B.  The Plaintiffs.......................................................................................... 6

    C.  Eligibility for Adjustment of Status Under 8 U.S.C. § 1255(a)............................7

III.  LEGAL STANDARD.........................................................................................8

IV.  ARGUMENT .....................................................................................................9

    A.  Plaintiffs have Standing to Sue .............................................................. 9

    B.  Plaintiffs are Likely to Succeed on the Merits ................................... 11

    C.  Plaintiffs will Suffer Irreparable Harm Absent Immediate Injunctive Relief… 13

        i.  Failure to adjudicate pending Employment-Based Adjustment of Status applications before September 30, 2021 will result in concrete and immediate harm directly to Plaintiffs that cannot be ascertained or repaired by monetary compensation .....................................................................14

        ii.  Failure to adjudicate pending Employment-Based Adjustment of Status applications before September 30, 2021, will result in some Plaintiffs' children losing the ability to have their applications approved… ...............15

        iii.  Failure to adjudicate pending Employment-Based Adjustment of Status applications before September 30, 2021 will result in the loss of visa numbers.......................................................................................... 17

    D.  The Balance of Hardships and Public Interest Weigh Heavily in Favor of Injunctive Relief......................................................................................17

V.  CONCLUSION................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*Aracely R. v. Nielsen,*
    319 F. Supp. 3d 110 (D.D.C. 2018) ...................................................................18

*Danielson v. Local 275,*
    479 F.2d 1033 (2d Cir. 1973)...........................................................................14

*Duke Power Co. v. Carolina Envtl. Study Group Inc.,*
    438 U.S. 59 (1978) .............................................................................................9

*eBay, Inc. v. MercExchange, L.L.C.,*
    126 S. Ct. 1837 (2006) .....................................................................................14

*Friends of the Earth, In. v. Gaston Copper Recycling Corp.,*
    204 F.3d 149 (4ᵗʰ Cir. 2000)..............................................................................9

*Glavin v. Clinton,*
    19 F. Supp. 2nd 543 (1998)..............................................................................10

*Gulf Coast Mar. Supply, Inc. v. United States,*
    218 F. Supp. 3d 92 (D.D.C. 2016), *aff'd,* 867 F.3d 123 (D.C. Cir. 2017) .....................18

*Immigrant Legal Res. Ctr. v. Wolf,*
    107 Fed. R. Serv. 3d (Callaghan) 2108 (N.D. Cal. 2020) ...............................12

*In re Microsoft Corp. Antitrust,*
    333 F.3d 517 (4th Cir. 2003) ...........................................................................14

*K.C. ex rel. Africa H. v. Shipman,*
    716 F.3d 107 (4ᵗʰ Cir. 2013)............................................................................10

*Kravitz v. U.S. Dep't of Commerce,*
    366 F. Supp. 3d 681 (D. Md. 2019) ...................................................................8

*League of Women Voters v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016) .............................................................................18

*Libertarian Party of Virginia v. Judd,*
    718 F.3d 308 (4th Cir. 2013)..............................................................................9

*MCI Telecommunications Corp. v. FCC,*
    627 F.2d 322 (D.C. Cir. 1980) ................................................................11

*Miranda v. Barr,*
    463 F. Supp. 3d 632 (D. Md. 2020) ........................................................18

*Multi-Channel TV Cable Co. v. Charlottesville Quality Operating Co.,*
    22 F.3d 546 (4th Cir. 1994) ...................................................................14

*Newdow v. Bush,*
    355 F. Supp. 2d 265 (D.C. Cir. 2005) ....................................................14

*Niken v. Holder,*
    129 S. Ct. 1749 (2009) ..........................................................................18

*Open Cmtys. All. v. Carson,*
    286 F. Supp. 3d 148 (D.D.C. 2017) .......................................................18

*Pashby v. Delia,*
    709 F.3d 307 (4th Cir. 2013)...................................................................8

*Public Citizen Health Research Group v. Auchter,*
    702 F.2d 1026 (D.C. Cir. 1983) .............................................................12

*Pursuing Am. Greatness v. FEC,*
    831 F.3d 500 (D.C. Cir. 2016) .................................................................8

*Real Truth About Obama, Inc. v. Fed. Election Comm'n,*
    575 F.3d 342 (4th Cir. 2009) ...................................................................8

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) ............................................................................9

*Telecommunications. Research & Action Center. v. FCC,*
    750 F.2d 70 (D.C. Cir. 1984) ...........................................................11, 12

*Town of Chester, N.Y. v. Laroe Estates, Inc.,*
    137 S. Ct. 1645 (2017) ............................................................................9

*Wang v. Blinken,*
    No. 20-5076, 2021 WL 2878848, (D.C. Cir. July 9, 2021) ...........................3

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008) ..............................................................................8, 18

## TABLE OF AUTHORITIES
### (continued)

5 U.S.C. § 555(b) ........................................................................................................ 11

8 U.S.C. § 1101(a)(16) ..................................................................................................3

8 U.S.C. § 1101(a)(20) ..................................................................................................2

8 U.S.C. § 1151(b)(2)(A)(i) ..........................................................................................4

8 U.S.C. § 1151(c)(1) ....................................................................................................4

8 U.S.C. § 1151(c)(1)(B)(ii) ..........................................................................................4

8 U.S.C. § 1151(c)(3)(C) ...............................................................................................3

8 U.S.C. § 1151(d)(1)(A) ...............................................................................................3

8 U.S.C. § 1151(d)(2)(B-C) ...........................................................................................3

8 U.S.C. § 1152(a)(2) ....................................................................................................4

8 U.S.C. § 1152(a)(5)(A) .........................................................................................6, 17

8 U.S.C. § 1153(b)(1)(A) ...............................................................................................6

8 U.S.C. § 1153(b)(1)(B) ...............................................................................................6

8 U.S.C. § 1153(b)(1)(C) ...............................................................................................6

8 U.S.C. § 1153(b)(2)(A) ...............................................................................................7

8 U.S.C. § 1153(b)(3)(A)(i) ...........................................................................................7

8 U.S.C. § 1153(b)(3)(A)(ii) ..........................................................................................7

8 U.S.C. § 1153(h)(1)(A) .........................................................................................15, 16

8 U.S.C. § 1153(h)(1)(B) ..............................................................................................16

8 U.S.C. § 1154(j) ...................................................................................................11, 13

8 U.S.C. § 1255(a) .....................................................................................................3, 7

8 U.S.C. § 1571(b) ..................................................................................................11, 13

### Regulations

20 C.F.R. § 656.10 .......................................................................................................7

Pub. L. No. 101-649, 104 Stat. 4978 ...........................................................................3

### Rules

84 Fed. Reg. 62280 (proposed rule, Nov. 4, 2019) ...................................................... 12

85 Fed. Reg. 46788 (final rule Aug. 3, 2020) ............................................................ 12


**Other Authorities**

David J. Bier, *Policy Analysis: Immigration Wait Times from Quotas Have Doubled*, 873 CATO Inst., June 18, 2019, at 11, available at http://www.cato.org/sites/cato.org/files/pubs/pdf/pa-873-updated.pdf .................................................................................................................... 5, 6

Andrew J. Pincus, *Memo to the Federation of American Scientist,* appendix (May 26, 2021). Ex. A ..................................................................................................................................... 6

William A. Kandel, Cong. Research Serv., R43145, U.S. Family-Based Immigration Policy 4 (2018) ................................................................................................................................... 6

Case Processing Times, available at https://egov.uscis.gov/processing-times/more-info (last visited July 30, 2021) (explaining how USCIS calculates its published case processing time ranges) ...................................................................................................................................................................................... 13

USCIS, Immigration and Citizenship national data, https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-data (last visited July 29, 2021) ...................................... 12

USCIS, Historical National Average Processing Time (in Months) for all USCIS Offices for Select Forms by Fiscal Year, available at https://www.uscis.gov/archive/historical-national-average-processing-time-in-months-for-all-uscis-offices-for-select-forms-by ........................ 13

## TABLE OF EXHIBITS

Plaintiffs' Declarations.................................................................................................Exhibit 1

## I.      INTRODUCTION

More than ever, the United States must recruit and retain the best international talent to compete in the global economy and maintain our national security. Congress created our employment-based permanent residency system to allow employers to fill jobs that suffer from an insufficient American workforce, and to encourage immigrants of extraordinary ability to remain in the United States and contribute their talents to our society. However, because the Department of Homeland Security ("DHS") has failed to timely adjudicate certain green card applications, more than one hundred thousand immigrant visas are going to be wasted and more than one hundred thousand Indian and Chinese professionals will miss their opportunity to become permanent residents. Instead, they will fall back into an interminable "backlog" of several years, sometimes decades, before they can immigrate.

Due to the COVID pandemic, an unusually low number of family-based green cards were approved in Fiscal Year 2020. Utilizing a Congressionally created formula, any unused family-based visas from Fiscal Year 2021 "roll over" into the employment-based category for Fiscal Year 2021. This roll over created a unique opportunity and obligation in Fiscal Year 2021 for U.S. Citizenship and Immigration Services ("USCIS," a component agency of DHS) to approve more employment-based green cards than the usual quota, thereby reducing the substantial wait for many Indian and Chinese applicants who are the beneficiaries of approved Immigrant Visa Petition

Beginning in October 2020, at the beginning of the fiscal year, USCIS announced it would accept applications from thousands of Indian and Chinese nationals who had already been waiting for years, and in some cases for over a decade. This was the ultimate bait and switch. Plaintiffs have followed the rules, completed the forms, abided by the onerous regulations and procedures, paid millions of dollars in filing fees that are just sitting in USCIS coffers, submitted their

1

applications for permanent residency, and are simply waiting for the agency to complete processing of their applications to receive permanent residency. USCIS has a clear non-discretionary duty to adjudicate the applications. However, if USCIS does not adjudicate their applications by September 30th, 2021, the end of this fiscal year, these additional visa numbers that have rolled over from the unused family category will be wasted. This will cause the already lengthy visa backlog to grow, and Plaintiffs will have to wait for further years -- or further decades -- before they become eligible for residency again. Plaintiffs, therefore, respectfully request that the Court intervene and grant this Motion for a Preliminary Injunction, enjoin the Defendants from wasting these additional "roll over" visa numbers and reserve all unused visa numbers for use in the next fiscal year.

Plaintiffs must prove four key points to succeed in this preliminary injunction. As a threshold matter, Plaintiffs have standing. Plaintiffs can also demonstrate the likelihood of success on the merits. The Plaintiffs and their derivative children will suffer immediate and irreparable harm if an injunction is not issued. Finally, granting this injunction would create little-to-no hardships for the Defendants, especially when weighed against the far greater public interest.

Plaintiffs have conferred with counsel for the Defendants and the Defendants oppose this motion.

## II.    BACKGROUND

Lawful permanent residency, colloquially known as a "green card," is the right to live and work in the United States indefinitely and is a pathway to citizenship. *See generally* 8 U.S.C. § 1101(a)(20). The Department of State ("DOS") can grant lawful permanent residency with an "immigrant visa" for individuals abroad, and the DHS through its agency USCIS can grant lawful permanent residency via "Adjustment of Status" for individuals present in the United States. 8

U.S.C. §§ 1101(a)(16), 1255(a).  The Plaintiffs' motion refers to both grants of residency as "visas" or "immigrant visas," as this is the terminology that DHS and DOS use when calculating annual limits on permanent residents.

### A.      STATUTORY AND REGULATORY BACKGROUND

The Immigration Act of 1990 amended the Immigration and Nationality Act of 1965 to establish family-based, employment-based, and diversity categories for permanent residency applications. Pub. L. No. 101-649, 104 Stat. 4978. Within each of these categories, Congress established an annual ceiling for the number of visas or adjustments of status that can be accepted. Within the employment-based categories, there are 140,000 available "visas" at the start of each fiscal year in October. 8 U.S.C. § 1151(d)(1)(A). In addition, any unused "visa numbers" from the family-based categories from the prior fiscal year "roll-over" to the employment-basedcategories and create additional visas above and beyond the 140,000 maximum. 8 U.S.C. § 1151(d)(2)(B-C). DOS and DHS are expected to annually issue the prescribed 140,000 employment-based visas, along with any "rolled over" visas from the family-based categories, within the fiscal year. Additionally, if there are "left over" numbers at the end of the year in the employment-based categories, these visas "roll back over" to the family-based categories for the following fiscal year. 8 U.S.C. § 1151(c)(3)(C).  By implementing a roll-over and roll-back systemfor visas, Congress meant to maximize the usage of visas and ensure that no visas go to waste in either category.

Both primary applicants and their "derivatives" (spouses and minor children becoming permanent residents) are counted against these annual limits. *See, e.g.*, *Wang v. Blinken*, No. 20-5076, 2021 WL 2878848, (D.C. Cir. July 9, 2021) (holding that family members of employment-based investor visa applicants are counted against the numerical limit for that category).

Family-based visas are allocated differently. There is no numerical limitation for "immediate relatives" (spouses, minor children, and parents of adult U.S. citizens). 8 U.S.C. § 1151(b)(2)(A)(i). However, allocation of immediate relative visas still counts against the overall family-based visa allocation. To calculate the maximum number of family-based visas for non-immediate relatives (such as the spouse of permanent residents and adult children of U.S. citizens), Congress established the following system: start with the number 480,000, subtract the number of immediate relative visas allocated the prior fiscal year, then add any unused employment-based numbers "rolled over" from the prior fiscal year. 8 U.S.C. § 1151(c)(1).

Because there are routinely more than 480,000 immediate relative visas issued each year (pre-pandemic), Congress also set a floor, or a minimum of 226,000 family-based visas for non-immediate relative family-based cases (such as spouses and children of permanent residents). This ensures that some visas will still be available for these groups even if the prior fiscal year had a particularly high number of immediate relatives. 8 U.S.C. § 1151(c)(1)(B)(ii).

In practice, this has meant that there are always exactly 226,000 family-based non-immediate-relative visas available because the consistently high number of immediate relative applications cancel out any visa numbers "rolled over" from the employment-based categories.

Additionally, the number of immediate relative petitions has increased since the roll-over system was instituted.[1] Between 2002 and 2018, the increase in immediate relative petitions has caused the demand for family-based visa numbers to historically reach only the statutory minimum of 226,000. The employment-based categories have subsequently lost the benefit of rolled-over visa numbers because of the family-based category consistently defaulting to the base of 226,000 visas.[2]

---

[1] Andrew J. Pincus, *Memo to the Federation of American Scientists,* appendix (May 26, 2021)
[2] William A. Kandel, Cong. Research Serv., R43145, U.S. Family-Based Immigration Policy 4 (2018).

The Immigration Act of 1990 also created per-country limitations, mandating that no country's citizens can make up more than 7 percent of the total number of family-based or employment-based visas in a given fiscal year.  8 U.S.C. § 1152(a)(2).

As a result of this per country limit, those countries with particularly high numbers of applicants in either the family or employment-based categories are placed in a queue, creating a line or "backlog" before they can apply for permanent residency. Within the employment-based category, the backlog is singularly long for those applicants from India and China. The roll-over numbers at issue in this case will directly affect the size of the backlog of Indian and Chinese nationals.  As employment-based visa numbers expire and go unused, rather than being diverted to the existing backlog, the visa backlog for Indian and Chinese nationals grows. In 2018, a Cato Institute study projected that an applicant from India with a bachelor's degree would wait an estimated **54 years** after her employer petitions for her before she is eligible to apply for permanent residency under the employment based third preference category.[3] These wait times are so dramatic that Cato estimated that thousands of immigrants will drop out of line by dying before they become eligible to apply for residency, reducing the projected wait-time to 49 years.  *Id.*

Under the current implementation of the rollover system, it is plausible that an employer could now wait decades for a petitioned employee, only to have that employee retire (or even die) before finally becoming eligible for a green card. This was not the intended result of the roll-over system. *Id.* When Congress established the roll-over system in 1990, the object was to improve wait times and reduce backlog in the immigration process. Indeed, if USCIS implemented the system as Congress intended, it would significantly reduce the existing backlog by allocating "rolled over" numbers to backlogged applicants.

---

[3] David J. Bier, *Policy Analysis:  Immigration Wait Times from Quotas Have Doubled,* 873 CATO Inst., June 18, 2019, at 11, http://www.cato.org/sites/cato.org/files/pubs/pdf/pa-873-updated.pdf

The roll-over process between the family-based and employment-based visa allocations is technically designed to benefit both categories of intending immigrants, as well as to reduce the hardship for people from countries with larger immigrant populations. In creating the roll-over system, Congress intended to allow both family-based and employment-based categories to maximize the use of the prescribed numbers by allowing them to roll back-and-forth until they have all been used, avoiding visa wastage, and reducing backlogs to the extent possible. As confirmation of this intent, Congress specifically exempted "rolled over" numbers from the employment-based per-country numerical limits, so that they could be used to reduce backlogs.  8 U.S.C. § 1152(a)(5)(A).

### B.       THE PLAINTIFFS

Plaintiffs are 196 Indian and Chinese nationals who filed applications for permanent residency during or before December of 2020, along with their dependent family members (spouses and minor unmarried children). DHS has approved I-140 Petitions for Alien Worker for each Plaintiff or their employer, establishing that the Plaintiffs are eligible to apply for residency as:

- "alien with extraordinary ability [whose work] will substantially benefit… the United States" (8 U.S.C. § 1153(b)(1)(A));
- "outstanding professors and researchers" (§ 1153(b)(1)(B));
- "multinational executives and managers" (§ 1153(b)(1)(C));
- "members of the professions holding advanced degrees or their equivalent or who because of their exceptional ability in the sciences, arts, or business, will substantially benefit prospectively the national economy, cultural, or educational interest, or welfare of the United States" (§ 1153(b)(2)(A));
- "skilled workers," immigrants with baccalaureate degrees and members of certain professions (§ 1153(b)(3)(A)(i) and (ii)).

6

Plaintiffs have all filed I-485 Applications for Permanent Residency with USCIS and have paid the required $1225 filing fee. Some have also paid an additional $1225 per applicant for "derivative" green card applications for their spouses and children, in addition to attorney's fees.

### C.      ELIGIBILITY FOR ADJUSTMENT OF STATUS UNDER 8 U.S.C. § 1255(a)

To be eligible for Adjustment of Status under 8 U.S.C. § 1255(a), the applicant must show that she is eligible to receive an immigrant visa and is admissible to the United States for permanent residence, and an immigrant visa is immediately available to her. For most employment-based applicants, this process begins with the applicant's prospective employer demonstrating to the Department of Labor ("DOL") that there are no able, willing, qualified, or available American workers for her position at the local prevailing wage. 20 C.F.R. §§ 656.10 et seq. The date the employer files the ETA 9089 Application for Alien Labor Certification marks the employee's place in line when waiting for a visa, also known as her "priority date." If the DOL approves the labor certification application, the prospective employer files an I-140 Immigrant Visa Petition with USCIS asking for approval to permanently employ the foreign national.

After USCIS approves the petition, the third and final step of the process for applicants who reside in the United States is to file an I–485 Application for Adjustment of Status with USCIS.  This application asks USCIS to change the foreign national's current nonimmigrant status to lawful permanent status based on the permanent employment offered by a U.S. employer.

Because of the per country caps on visas, foreign nationals from India and China are subject to a visa backlog, and there are many years between USCIS's approval of the Form I-140 petition and the eligibility to file for Adjustment of Status.

To file for Adjustment of Status, foreign nationals in the backlog must await confirmation of their ability to file based on USCIS Adjustment of Status Filing Charts, which are issued by the

agency monthly and confirm the Form I-140 priority dates of applicants who are eligible to file for Adjustment of Status that month.

### III.     LEGAL STANDARD

The purpose of a preliminary injunction is to "maintain the status quo and prevent irreparable harm while a lawsuit remains pending." *Pashby v. Delia,* 709 F.3d 307, 319 (4th Cir. 2013).  When considering a motion for preliminary injunction, the Court considers four factors: (1) the party is likely to succeed on the merits of the claim; (2) the party is likely to suffer irreparable harm in the absence of an injunction; (3) the balance of hardships weighs in the party's favor; and (4) the injunction serves the public interest. *Id.* at 320 (citing *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)). All four factors must be satisfied to obtain a preliminary injunction. *See Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated and remanded on other grounds*, 559 U.S. 1089 (2010). However, where the government is a party, factors three and four merge.  *See Kravitz v. U.S. Dep't of Commerce*, 366 F. Supp. 3d 681, 755 (D. Md. 2019) (quoting *Pursuing Am. Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

### IV.     ARGUMENT

#### A.     PLAINTIFFS HAVE STANDING TO SUE

As a threshold matter, Plaintiffs have standing. To show standing for purposes of a preliminary injunction, Plaintiffs must show that it is substantially likely that at least one has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016); *Libertarian Party of Virginia v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013). If one plaintiff establishes standing, the court need not consider the standing of the other plaintiffs to raise that claim. *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017) ("At

8

least one plaintiff must have standing to seek each form of relief requested in the complaint.").

All three requisite factors to establish standing as outlined by *Spokeo* have been met in this case. To       qualify for standing, an injury in fact must be shown to be "concrete and particularized, as well as actual and imminent." *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 154 (4th Cir. 2000). In their declarations, each Plaintiff included reports of injuries that are "concrete" and "particularized," as well as "imminent" and ongoing. *See generally* Exhibit 1 (Plaintiffs' declarations). To satisfy the "fairly traceable" element, a plaintiff need only show that the defendant's conduct is a "but for" cause of their injury. *See Duke Power Co. v. Carolina Envt'l. Study Group Inc.*, 438 U.S. 59, 78 (1978); *Glavin v. Clinton,* 19 F. Supp. 2nd 543, 550 (1998). In the instant case, the Plaintiffs' injuries occur as a direct result of their pending Adjustment of Status applications before USCIS. Finally, a plaintiff must show that the Court has the power to grant relief that will redress the plaintiff's injury. *See K.C. ex rel. Africa H. v. Shipman*, 716 F.3d 107, 116-17 (4th Cir. 2013). Here, a favorable decision by this Court could directly reverse the effects of imminent and ongoing injuries sustained by the Plaintiffs.

All Plaintiffs are injured by the Defendants' failure to timely adjudicate their applications, because if the applications are not approved by September 30, 2021, Plaintiffs risk waiting months or possibly years more before becoming permanent residents.  Their careers are in limbo, it is risky for them to travel abroad to see their families, and they are delayed on the pathway to achieving citizenship and all its benefits, including full economic and civic participation. For example, Plaintiff Dr. Atreyi Chakrabarti and her spouse filed for Adjustment of Status in 2012. Dr. Chakrabarti and her spouse are both physicians treating COVID-19 patients and putting their own health at risk to combat the pandemic.  They have waited for years to get their green cards, passing up job and career advancement opportunities while awaiting USCIS' action.  After more than nine years, their priority date is now current, but USCIS still will not issue their green cards. *See*

Plaintiff Chakrabarti's declaration at Exhibit 1.

Plaintiffs' injuries would be redressed by a timely and favorable decision in this case. If this Court orders Defendants to adjudicate the Plaintiff's Adjustment of Status applications before September 30, 2021, the Plaintiffs' injuries would be prevented. To illustrate, Plaintiff Vivek Kota's daughter is at risk of turning 21 and aging-out of eligibility for adjustment of status if his application is not timely adjudicated. She is one of several children of Plaintiffs who are in danger of aging-out of the citizenship process. *See* Plaintiff Kota's declaration at Exhibit 1. If a Plaintiff's child "ages-out," then the child is no longer eligible to obtain a green card as a derivative to their parent's employment process, and the child will be left with no lawful status in the United States, despite often having grown up knowing no other country, and the family would risk separation. If Plaintiff Kota's Adjustment of Status application was adjudicated in a timely manner, then his daughter would no longer be at risk of losing her chance to gain citizenship in the only country she has ever known. The same is true of all Plaintiffs with children at risk of aging-out.

These two Plaintiff examples are among the many collected declarations which uniformly illustrate concrete imminent, and ongoing injuries which are directly traceable to the Defendants, but which could be redressed through a favorable decision by this Court. These declarations establish standing, and based on this standing, the Plaintiffs ask that this Court compel the Defendants to adjudicate all visa numbers available for pending employment-based Adjustment of Status applications before September 30, 2021, to avoid wasting the visa numbers as there are enough filed adjustment of status application to utilize all available numbers for fiscal year 2021. In the alternative, Plaintiffs request this Court to reserve unused visa numbers from this fiscal year beyond September 30, 2021. This reservation would ensure that the employment-based category would fully benefit from the unused roll-over visa numbers from the family-based category

Utilizing the available visa numbers benefits those plaintiffs with derivative children at risk

of aging-out.  Utilizing all available numbers will also help to solve future backlogs and allow for future retrogression in available visa numbers for the following fiscal year, impacting future employment-based applicants.

Plaintiffs request that this Court order USCIS to reserve green cards numbers for Plaintiffs and similarly situated applicants even if their applications have not yet been adjudicated.  This resolves the potential waste of visa numbers and aging-out of derivative children. Thecourt has authority to reserve visa numbers as outlined in *Almaqrami v. Pompeo*. 933 F.3d 774, 781–82, (D.C. Cir. 2019). Though the D.C. Circuit never reached the merits of the district court'sauthority to issue post-fiscal year relief, its reasoning is instructive. "When a plaintiff files suit andthe court grants some relief—but not the visa—before October 1 . . ., the court might lawfully takesteps to compel the government to process the plaintiff's application and issue her a [...] visa" even "after the fiscal year has ended." *Id.* In such an instance, the court observed, a post-deadlineorder would permissibly "give effect to the district court's prior directive, entered before the end of the selection FY, to preserve an essential (and otherwise expiring) ingredient of relief." *Id.* at 782.

Courts in other circuits also recognize this temporal distinction on the availability of relief. In *Paunescu v. INS*, 76 F. Supp. 2d 896 (N.D. Ill. 1999), for example, the district court ordered the Government to adjudicate visa applications before the September 30 deadline, and after the Government failed to do so, the court ordered it to "process [the] applications and to grant [the applicants] all relief to which they would have been entitled had defendants processed their applications in a timely fashion"—even though the order compelling such relief was issued more than a year after the 1998 fiscal year had closed. *Id.* at 903.

Likewise, in *Przhebelskaya v. USCIS*,338 F. Supp. 2d 399 (E.D.N.Y. 2004), the district court had issued an order on September 24, 2003, compelling the Government to adjudicate diversity visa applications, and when the Government failed to do so within the fiscal year, the court

issued an order compelling adjudication of the applications after the fiscal year deadline, *see id.* at 406. The court explained that "the expiration of the statutory deadline" did not "extinguish [] the [defendants'] obligation to comply with the court's order," and that where the court has ordered the Government to act on a diversity visa application, "the court has the power to vindicate its own order" by compelling post-deadline adjudication. *Id.* at 403.

Just this week, a Federal District Court Judge in D.C. ordered the State Department process an additional 9,095 diversity visas, *which he had previously reserved in the preliminary injunction,* from the 2020 Diversity Visa program, even though the program closed on September 30, 2020. *Gomez, et. al.   v. Biden, et. al.*, No 20-cv-01419 (D.D.C., August 16, 2021) (decision granting summary judgement in part).  Judge Mehta noted " . . . because additional relief was necessary to meet the exigencies of the case, the court concluded that it had the equitable authority to order Defendants to reserve visas for future processing pending final resolution of the merits of this case." Id. at 4.

Alternatively, the court should construe the immigrant visa allocation statute 8 U.S.C. section 1151 consistently with 8 U.S.C. 1184(g) which deals with the allocation of the statutorily mandated cap of 65,000 H-1B visas.  It is arbitrary and capricious to interpret the same statutory language differently in two sections of the same statute.

Like the immigrant visa system , Congress has established limits on the number of foreign workers who may be granted initial H-1B nonimmigrant visas or status each fiscal year (FY).  8 U.S.C. § 1184(g). The total number of cap-subject foreign workers who may be granted initial H-1B nonimmigrant status during any FY currently may not exceed 65,000. 8 U.S.C. § 1184(g). Congress has come up with a complicated system for allocating the visas but the statutory language in the H-1B statute nearly mirrors the language of the immigrant visa statute and clearly refers to the visas being allocated in the fiscal year.  The statute provides:

  (g) Temporary workers and trainees; limitation on numbers

    (1) The total number of aliens who may be issued visas or otherwise provided nonimmigrant status *during any fiscal* year (beginning with fiscal year 1992)—

      (A) under section 1101(a)(15)(H)(i)(b) of this title, may not exceed— . . .

      (vii) 65,000 in each succeeding fiscal year.

8 U.S.C. §1184(g)(1)(emphasis added).

  Similarly, 8 U.S.C. 1151(d) provides:

  (d) Worldwide level of employment-based immigrants

    (1) The worldwide level of employment-based immigrants under this subsection *for a fiscal year* is equal to—

    (A) 140,000, plus

    (B) the number computed under paragraph (2). . . .

    (C) The number computed under this paragraph for a subsequent fiscal year is the difference (if any) between the maximum number of visas which may be issued under section 1153(a) of this title (relating to family-sponsored immigrants) during the previous fiscal year and the number of visas issued under that section during that year.

8 U.S.C. §1151(d)(emphasis added).

Arguably, the language of 8 U.S.C. section 1151 is broader because when it refers to the number of visas available "for a fiscal year," whereas 8 U.S.C. section 1184 uses the language "during any fiscal year." However, the language is similar enough between the two provisions that they ought to be construed in the same manner.

  However, USCIS does not construe the language in the same manner. USCIS construes the language of 8 U.S.C. section 1184(g) such that the visa number is reserved when the petition is filed with USCIS regardless of when it is ultimately adjudicated and the visa issued. To similarly hold Adjustment of Status visa numbers at the time of filing would create consistency between the statutory language and between the way the two systems allocate visas.

It is a fundamental canon of statutory interpretation that the provisions of a text should be interpreted in a way that renders them compatible and not contradictory. *Ratzlaf v. United States*, 510 U.S. 135, 143 (1994). It is also a fundamental principle that the whole statute should be read in harmony with its various parts being interpreted within their broader context to further the overall statutory purpose. *Brotherhood of Locomotive Engineers v. Atchison*, *T. & S.F.R.R.*, 516 U.S. 152, 157 (1996) (the purpose of the Hours of Service Act, to promote safety by ensuring that fatigued employees do not operate trains, guides the determination of whether employees' time is "on duty").

USCIS's unexplained inconsistency prejudices family and employment-based green card applicants by causing unnecessary waste of Congressionally-mandated visa numbers, and exacerbates the green card backlogs. This arbitrary and capricious interpretation especially hurts employment-based applicants from India and China, including each of the Plaintiffs in this case. If USICS were ordered to be consistent in its interpretation of the same statutory wording, it would create consistency with the two systems and resolve the potential for wasted visa numbers or age-out issues for derivative children. USCIS's unexplained inconsistency prejudices family and employment-based green card applicants by causing unnecessary waste of Congressionally-mandated visa numbers, and exacerbates the green card backlogs. This arbitrary and capricious interpretation especially hurts employment-based applicants from India and China, including each of the Plaintiffs in this case.

## B.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

The Plaintiffs are likely to succeed in demonstrating that the Defendants' failure to timely process their applications is unreasonable and not compliant with statutory law or Congress' expectation that immigration benefits will be processed within 180 days. *See* 8 U.S.C. § 1571(b) (2021); 8 U.S.C. § 1154(j) (2021). The Administrative Procedure Act ("APA") requires that an

agency conclude a matter presented to it "within a reasonable time."  5 U.S.C. § 555(b) (1982). To determine what constitutes a reasonable time, courts have looked to factors laid out in *Telecommunications, Research & Action Center v. FCC,* 750 F.2d 70, 80 (D.C. Cir. 1984), commonly referred to as "TRAC factors." Included among these factors is a definition of "unreasonable" that provides that an agency's action can be deemed unreasonable if it falls outside or in excess of the agency's own "prescribed" rates or conditions. *See Public Citizen Health Research Group v. Auchter*, 702 F.2d 1026, 1034 (D.C. Cir. 1983); *MCI Telecommunications Corp. v. FCC*, 627 F.2d 322, 340 (D.C. Cir. 1980). Another factor stresses that "where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed . . . [that] may supply content for this rule of reason." *Telecommunications* at 80. When the actions of the Defendants in the instant case are evaluated against these and other TRAC factors, it is apparent that the Defendants have failed to process the applications of the Plaintiffs within a reasonable time, which is a violation of the requirements of the APA.

The most recent data available from USCIS indicates that approximately 273,000 employment-based green card applications were pending as of March 31, 2021.[4] Based on information from USCIS' own "Fee Schedule and Changes," a USCIS officer requires an average of 98 minutes to adjudicate an I-485 Application for Permanent Residency.[5] Further, employment-based Adjustment of Status applications should take less time than this average, as they typically do not require an in-person interview at a local field office and can be adjudicated at one of USCIS' several large Service Centers. However, at the pace that USCIS is currently processing, the approximately 273,000 pending employment-based Adjustment of Status applications will take

---

[4] USCIS, Immigration and Citizenship, national data, available at:  https://www.uscis.gov/tools/reports-and-studies/immigration-and-citizenship-data (last visited Aug.8, 2021).
[5] USCIS Fee Schedule Changes, 84 Fed. Reg. 62280 (proposed rule, Nov. 4, 2019), 85 Fed. Reg. 46788 (final rule Aug. 3, 2020)(enjoined by *Immigrant Legal Res. Ctr. v. Wolf,* 107 Fed. R. Serv. 3d (Callaghan) 2109 (N.D. Cal 2020).

significantly more than one year to process, leaving little hope that all the Plaintiffs' applications will be successfully adjudicated by the September 30th deadline.

USCIS is currently processing more than half of the Plaintiffs' applications at their Texas and Nebraska Service Centers. USCIS reports that the median processing time for employment-based green card applications at the Texas Service Center is 27 months, while approximately 7% of cases take over 62.5 months.[6]  At the Nebraska Service Center, the median applicant can expect to wait 11 months, while 7% take longer than 17 months.[7]

These lengthy and wildly divergent processing times are part of a trend that predates the COVID-19 pandemic. Although the underlying law and procedure have not changed, delays for employment-based green card applications have increased annually for the last five years. The agency took approximately 6.8 months to adjudicate an employment-based green card application in Fiscal Year 2016, then 8.1 months in Fiscal Year 2017, 11.1 months in Fiscal Year 2018, 12.  months in Fiscal Year 2019, and 14.4 months in Fiscal Year 2020.[8]

These processing times are not justified by the Defendant's own projection for the time needed to review and adjudicate applications for Adjustment of Status, nor are they in accordance with Congress' expectation that immigration benefits will be processed within 180 days. Instead, USCIS's processing delays are of its own making. USCIS took months to accept and receipt Plaintiff's cases at its lockboxes and service centers, improperly rejected cases, and failed to timely process cases that

---

[6] USCIS, Immigration and Citizenship Data, *supra* note 4.  *See also,* Case Processing Times, https://egov.uscis.gov/processing-times/more-info (last visited Aug. 17, 2021)(explaining how USCIS calculates its published case processing time ranges).
[7] *Id.*  The inconsistency in processing times between the two service centers based solely on where the applicant resides is another arbitrary and capricious action that subjects those who live in the Texas Service Center to longer processing times is a lawsuit for another day.
[8] USCIS, Historical Average Processing Time (in months) for all USCIS offices for Select Forms by Fiscal Year, https://www.uscis.gov/archive/historical-national-average-processing-time-in-months-for-all-uscis-offices-for-select-forms-by .

it has been holding in abeyance at its own facilities for many years. The agency is responsible for these lengthy and unreasonable delays in processing Plaintiff's applications and is therefore in violationof the reasonable time requirements of the APA.

### C.   PLAINTIFFS WILL SUFFER IRREPARABLE HARM ABSENT IMMEDIATE INJUNCTIVE RELIEF

Defendant's failure to adjudicate the Plaintiff applications in a reasonable and timely manner is not only a violation of the APA, but in absence of an injunction, the continued delay will also cause irreparable harm. A showing of irreparable harm is necessary for a grant of preliminary injunction, and the harm must be concrete and "immediate enough to warrant extraordinary injunctive relief." *Newdow v. Bush*, 355 F. Supp. 2d 265, 291 (D.C. Cir. 2005). Irreparable harm can be shown "when monetary damages are difficult to ascertain or are inadequate." *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994) (quoting *Danielson v. Local 275*, 479 F.2d 1033, 1037 (2d Cir. 1973). Further, where a preliminary injunction is mandatory rather than prohibitory, as is the casehere, then it is necessary to demonstrate that the injunction is necessary "both to protect against irreparable harm in a deteriorating circumstance created by the defendant and to preserve the court's ability to enter ultimate relief on the merits of the same kind." *In re Microsoft Corp. Antitrust*, 333 f.3d 517, 526 (4th Cir. 2003), abrogated on other grounds by *eBay, Inc. v. MercExchange, L.L.C.* 126 S. Ct. 1837 (2006).

> i.   *Failure to adjudicate pending Employment-Based Adjustment of Status applications before September 30, 2021 will result in concrete and immediate harm directly to Plaintiffs that cannot be ascertained or repaired by monetary compensation.*

Plaintiffs are currently suffering immediate harms because of the delayed processing of their Employment-based adjustments, as shown in the Plaintiff declarations. *See* Exhibit 1. Plaintiffs have already waited years or decades to apply for a green card and have already experienced delaysthat

have increased throughout the passing years because of Defendants' actions.[9] Further failure to adjudicate these claims by the end of the fiscal year on September 20, 2021, will force Plaintiffs who have already waited for years or decades to remain in limbo even longer. This will result in hardship to the Plaintiffs in the form of deferred career plans, lost jobs as a result of expiring employment authorization cards, an inability to access in-state tuition for their own and their children's schooling, and an inability to travel home to see their families for fear of not being able to return (since both Indian and Chinese nonimmigrant visa holders are subject to COVID-19 travel bans while green card holders are not). These hardships constitute injuries that are concrete and immediate, and that by their very nature are impossible to satisfy or rectify by monetary reward. These hardships can be forestalled, however, by an injunctive remedy that mandates USCIS to process the outstanding claims in a timely manner.

> ii.  *Failure to adjudicate pending Employment-Based Adjustment of Status applications before September 30, 2021, will result in some Plaintiffs' children losing the ability to have their applications approved.*

In addition to the economic, educational, and travel related harms that Plaintiffs are suffering because of USCIS's unreasonable processing delays, many Plaintiffs also face the constant fear that their children will "age out" due to USCIS dysfunction.

In 2002, Congress enacted the Child Status Protection Act ("CSPA") to underscore the importance of protecting immigrant children from this terrible scenario.  In the employment-based context, the CSPA protects children from USCIS processing delays based on the status of their parent's Form I-140 petition. *See* 8 U.S.C. § 1153(h)(1)(A). The CSPA locks in a child's age at the time that the priority date of their parent's approved Form I-140 petition becomes current. If the child is under twenty-one when that occurs, they are protected from aging out so long as they

---

[9] *See supra,* Part IV B.

apply for permanent residency within one year of the date their age is locked in. If a child is over the age of twenty-one at the time the age is locked in, the CSPA subtracts the Form I-140 processing time from the child's biological age to obtain the "CSPA age." 8 U.S.C. § 1153(h)(1)(B). If the "CSPA age" is under twenty-one on the date the parent's approved Form I-140 becomes current, the child can file for a green card within one year.  8 U.S.C. § 1153(h)(1)(A)-(B)

Barring injunctive relief, USCIS's processing delays will allow hundreds of thousands of immigrant visas to expire, and the agency will be forced to stop advancing the priority dates of applicants with approved Form I-140 petitions. This will prevent these applicants' children from "locking-in" their age under the CSPA, and many children who have been living lawfully in the United States for years will age out because their parent's approved Form I-140s are not current.

Plaintiff Kota is currently facing this precise scenario. Plaintiff Kota has been working in the United States since 2007.  Plaintiff Kota already suffered the heartbreak of his son aging out in 2019 while he waited for the backlog to clear. He filed his Form I-485 Adjustment of Status concurrently with an EB-3 Form I-140 downgrade petition on October 27, 2020 with a priority date of March 28, 2014. *See* Plaintiff Kota's declaration at Exhibit 1. Plaintiff Kota's daughter turns twenty-one on December 5, 2021. According to USCIS' August Adjustment of Status Charts, the current priority date for EB-3 petitions for Indian nationals is July 1, 2013. If USCIS lets the visa numbers expire and Plaintiff Kota's Form I-140 is approved without the priority datebeing current, each day will bring his daughter one day closer to aging out, losing the opportunity for a green card, and further shattering the Kota family.  The harm caused by this lapse is a concreteand immediate harm that will befall numerous Plaintiffs, yet it can be entirely avoided by a grant of injunctive relief in this case.

iii.    *Failure to adjudicate pending Employment-Based Adjustment of*

*Status applications before September 30, 2021, will result in the loss of visa numbers.*

If USCIS does not take immediate action to prioritize and process these green card applications, thousands of visa numbers that Congress intended the agency to utilize to alleviate backlogs for Indian and Chinese nationals will disappear forever. This loss of visas is directly oppositional to the original intent of Congress, who designed the roll-over system, in part, to reduce the hardship for people from larger countries where a higher demand for visas could create longer wait times. Congress intended to allow both family-based and employment-based categories to use the prescribed numbers to roll back-and-forth until they have all been assigned, avoiding wastage. 8 U.S.C. § 1152(a)(5)(A).

However, barring injunctive relief, this Congressional intent will be ignored, as thousands of Indian and Chinese nationals who should benefit from this Congressional foresight will in fact have their visas 'time out" and be lost due to USCIS inaction. This constitutes an irreparable harm in a deteriorating circumstance that has been created by the Defendant. A grant of a mandatory injunction to stay this harm would preserve this Court's ability to enter ultimate relief on this matter in a further mandamus suit.

### D.   THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST WEIGH HEAVILY IN FAVOR OF INJUNCTIVE RELIEF

Finally, Plaintiffs have established that "the balance of equities tips in [their] favor and that an injunction is in the public interest." *See Winter*, 555 U.S. at 20. Because the government is the opposing party here, these factors merge. *Niken v. Holder*, 129 S. Ct. 1749, 1762 (2009); *Aracely R. v. Nielsen*, 319 F. Supp. 3d 110, 156 (D.D.C. 2018). The Court should weigh the "competing claims of injury" and "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. While Plaintiffs face real and irreparable injuries without

20

relief, there is no real harm or public interest weighing against an injunction in an immigration matter. "[T]he granting of a preliminary injunction does not seriously infringe on the government's interest in enforcing its immigration laws," according to *Miranda v. Barr*, 463 F. Supp. 3d 632, 651 (D. Md. 2020).

Defendants cannot claim a cognizable interest in further delaying the adjudication of plaintiffs' applications. "There is generally no public interest in the perpetuation of unlawful agency action," *League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016), and the Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice," *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017). Conversely, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations," *League of Women Voters*, 838 F.3d at 12 (citation and internal quotation marks omitted), including the APA. *Gulf Coast Mar. Supply, Inc. v. United States*, 218 F. Supp. 3d 92, 101 (D.D.C. 2016), *aff'd*, 867 F.3d 123 (D.C. Cir. 2017). USCIS can address the issues of ongoing Plaintiff harms, the risk of Plaintiffs' children approaching an aging-out date, and of potentially losing visa numbers by adjudicating the plaintiffs' Adjustment of Status application by September 30, 2021.

Finally, any harm to the government is largely of the government's own design. The USCIS is largely a user-funded agency. The applicants for these benefits have paid filing fees thatCongress has allocated for the purpose of hiring adjudicators to timely adjudicate these types of cases. Additionally, Congress annually allocates funding to the USCIS through the appropriationsprocess. If USCIS does not have the capacity to timely adjudicate cases, the agency can remedy this by increasing filing fees or requesting more appropriations for hiring.

In short, any impact resulting from the agency's prompt adjudication of the Plaintiff's applications is outweighed by the specific and *permanent* harms that Plaintiffs will suffer absent

an injunction. The Court should grant relief.

## V.    CONCLUSION

The Court should issue a preliminary injunction requiring Defendants adjudicate the Plaintiffs' Adjustment of Status applications by September 30, 2021. In the alternative, the Court should issue a preliminary injunction ordering Defendants to "hold" all unused employment-based visa numbers from Fiscal Year 2021 into Fiscal Year 2022 rather than letting them "roll over" and expire, so that Plaintiffs can be reasonably assured that their cases will be adjudicated in Fiscal Year 2022.  In the alternative, the Court should issue a preliminary injunction ordering Defendants to consider a visa number "reserved" at the time an applicant files her I-485, such that Plaintiffs' cases can be adjudicated in Fiscal Year 2022.

Respectfully submitted this___20th___day of August, 2021;


___/s/ Jeff D. Joseph_

JEFF D. JOSEPH
District of MD Bar ID: : 22325
Atty. Reg. No. (Colorado) 28695
Joseph & Hall P.C.
12203 East Second Avenue
Aurora, CO 80011
(303) 297-9171
jeff@immigrationissues.com

CHARLES H. KUCK
Georgia Bar #: 429940
Kuck Baxter Immigration, LLC
365 Northridge Rd, Suite 300
Atlanta, GA 30350
ckuck@immigration.net
*Appearing pro hac vice*


GREG SISKIND
Tennessee Bar #: 14487

22

Siskind Susser PC
1028 Oakhaven Rd.
Memphis, TN 38119
gsiskind@visalaw.com
*Appearing pro hac vice*

Attorneys for Plaintiffs

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on August 20th, 2021, the foregoing document was served on all parties or their counsel of record through the CM/ECF system.


__/s/ Jeff Joseph__
Jeff D. Joseph
Joseph & Hall P.C.
12203 East Second Avenue
Aurora, CO 80011
(303) 297-9171
jeff@immigrationissues.com
D.C. Bar ID: CO0084

24