# EXHIBIT 1

PHILLIP A. TALBERT
Acting United States Attorney
AUDREY B. HEMESATH
Assistant United States Attorney

501 I Street, Suite 10-100
Sacramento, California 95814
Telephone: (415) 436-6985
audrey.hemesath@usdoj.gov

Attorneys for Defendants

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

|  |  |
|---|---|
| RAIDAN KASSEM, et al., | Case No. 1:21-cv-1400-DAD HBK |
| Plaintiffs, | **DEFENDANTS' EMERGENCY MOTION FOR RECONSIDERATION** |
| v. | |
| ANTONY J. BLINKEN, et al., | Honorable Dale A. Drozd |
| Defendants. | |

## REQUEST FOR IMMEDIATE RECONSIDERATION

The United States seeks emergency reconsideration of the Court's order granting an emergency preliminary injunction.  On September 23, 2021, the district that has proper venue over these diversity visa cases—the District Court for the District of Columbia—concluded that there was no grounds to compel adjudication of the diversity visas before the end of the fiscal year and declined a preliminary injunction. *Pushkar v. Blinken*, 21-cv-2297 CKK (D.D.C. Sept. 23, 2021) (Attachment A); *Serakova v. Biden*, 21-cv-2066-TNM (D.D.C. Sept. 24, 2021) (minute order)*.

Reconsideration is appropriate in this case pursuant to Local Rule 230(j), based on these new decisions from the District Court for the District of Columbia.  Local Rule 230(j) (permitting applications for reconsideration based on "other grounds").  These decisions were being made in the narrow window after briefing had concluded in this case.

The United States is unaware of any other district that has retained venue in a diversity visa case involving visa applications abroad outside the District of Columbia.  In its Order, the Court found that venue was established through the standing of plaintiff Kassem, given his status as a prospective employer.  CR 10 pg. 6.  The Court notes that the government did not cite any precedent for the proposition that prospective employers lack standing in diversity visa cases.  CR 10 pg. 6.  But it is Kassem's burden to establish standing, not the government's burden to disprove standing.

The error in the Order granting a preliminary injunction regarding Kassem's standing meant that the Court retained a case that should have been transferred to the District Court for the District of Columbia.  That court has now determined the merits of the diversity visa adjudication question contrary to this Court's findings in the Order granting a preliminary injunction.  This Court should reconsider its Order and transfer venue to the District Court for the District of Columbia as soon as possible.

## I.      IT IS KASSEM'S BURDEN TO ESTABLISH THAT HE HAS STANDING, AND HE FAILED TO MEET THAT BURDEN.

Plaintiff Kassem has the burden to establish standing.  *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir.2015). "To establish standing, a plaintiff must show that (1) he or she has suffered an injury in fact that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the challenged conduct; and (3) the injury is likely to be redressed by a

1    favorable court decision." To establish injury in fact, a plaintiff must show that he or she suffered "an

2    invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent,

3    not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal

4    quotations omitted).

5            Because standing is "an indispensable part" of a plaintiff's case, "each element must be

6    supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with

7    the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S.

8    at 561.

9            Kassem has not met this burden. His claim that he incorporated a corporation, spent money on

10   attorney's fees, and intends to hire a diversity visa selectee is insufficient to show that he has a "legally

11   protected interest" in the outcome of the diversity visa lottery adjudication. *Id.* at 60. Under Kassem's

12   theory of standing, any United States citizen could gain standing to challenge the outcome of any type of

13   immigrant visa—not just diversity visas—simply by stating an intent to employ that prospective

14   immigrant.

15           The "zone of interests" in immigration cases is narrow, and is dictated by the specific portion of

16   the Immigration and Nationality Act that governs the particular visa sought. *Vemuri v. Napolitano*, 845

17   F. Supp. 2d 125, 130–31 (D.D.C. 2012) (finding that "plaintiff cannot invoke the "zone of interests"

18   protected by the INA at large to establish prudential standing in this case."). Kassem's claim to standing

19   is based on the general idea that he wishes to employ an immigrant. But "[t]he Supreme Court has

20   squarely disallowed such a kitchen-sink approach, however, and requires litigants to identify the

21   relevant provisions with some particularity." *Programmers Guild, Inc. v. Chertoff*, 338 Fed.Appx. 239,

22   242 (3d Cir.2009) (*citing Air Courier Conference of Am. v. Am. Postal Workers Union*, 498 U.S. 517,

23   529–30, (1991)). Although the Court "do[es] not look at the specific provision said to have been

24   violated in complete isolation," the Court must look "only to provisions having an 'integral relationship'

25   with the provisions under which the suit was brought." *Fed'n for Am. Immig. Reform, Inc. v. Reno*, 93

26   F.3d 897, 903–04 (D.C.Cir.1996) (*quoting Air Courier Conference*, 498 U.S. at 530).

27           In the case, the "relevant provision" is 8 U.S.C. § 1153(c). Through the diversity visa program, a

28

1   limited number of immigrant visas are made available to individuals from countries that historically

2   have had low rates of immigration to the United States.  Under the program, diversity visas are allocated

3   to natives of these states according to a formula established by statute.  8 U.S.C. § 1153(c)(1).

4   A diversity visa enables the recipient to move to the United States as a lawful permanent resident.

5           "The relevant question, then, is whether Plaintiff's interests in [employing Nasser] in the United

6   States [] [is] arguably within the zone of interests protected by these sections of the INA.  The Court

7   need not undertake an exhaustive review of what interests are arguably protected by the provisions

8   because it is clear that Plaintiff's interests are inconsistent with the purpose of the relevant portions of

9   the INA."  *Vemuri v. Napolitano*, 845 F. Supp. 2d at 130–31.

10          The diversity visa section of the INA is about creating opportunities for individuals from

11  countries with historically low rates of immigration to the United States to immigrate without requiring

12  a U.S.-based sponsor.  8 U.S.C. § 1153(c).  Kassem's interest in employing Nasser does not fall within

13  that zone of interests.  He asserts the interests of a petitioner under 1153(b) (employment-based visa),

14  while the immigrant visa application of Nasser and his family is authorized solely on 1153(c).

15          Additionally, Kassem is the brother of Nasser.  As the Ninth Circuit in *Khachatryan* has found

16  that "an adult citizen has no fundamental right to have his or her unadmitted nonresident alien parent

17  immigrate into the United States," and thus a U.S.-citizen petitioning for her mother under the INA, "has

18  no constitutional liberty interest that is protected by the Due Process Clause under the approach set forth

19  in the *Din* plurality."  *Khachatryan v. Biden*, 4 F.4th 841, 860 (9th Cir. 2021) (referencing *Kerry v. Din*,

20  576 U.S. 86 (2015)) ("Because an adult citizen has no fundamental right to have his or her unadmitted

21  nonresident alien parent immigrate into the United States, Danuns has no constitutional liberty interest

22  that is protected by the Due Process Clause under the approach set forth in the *Din* plurality.").  It is an

23  odd result that the U.S. citizen does not have a constitutionally cognizable liberty interest that would

24  allow her to challenge her mother's visa denial after having petitioned for her to receive such visa as

25  required by the Immigration and Nationality Act, but an individual claiming to be the prospective

26  employer does have standing to challenge visa processing in an individual's prospective visa application

27  while having no formal connection to the case under the Immigration and Nationality Act.  This Court

28

should reconsider its initial finding that Kassem has standing to bring suit on behalf of the Nasser family, and should therefore find a lack of venue.

## II.    THE DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CORRECTLY RECOGIZED THAT  DIVERSITY VISA SELECTEE HAS NO RIGHT TO HAVE THE VISA ADJUDICATED BEFORE THE END OF THE FISCAL YEAR.

The core of this Court's decision is stated on page 8 of the Order: "Plaintiffs are entitled to the opportunity to have their visa adjudicated as prescribed by 8 U.S.C. § 1202(b)."  CR 10 pg. 8.

The District Court for the District of Columbia has held otherwise, finding that there is no right to have a diversity visa scheduled before the end of the fiscal year:

> Although the Court agrees with the rationale articulated in Gomez I that the September 30 deadline to issue diversity visas indicates the "speed" at which Congress intended these visas to be processed, the INA does not impose any obligation on Defendants to process all diversity visas by the end of the fiscal year. See 8 U.S.C. 1154(a)(1)(I)(ii)(II) ("[A]liens who qualify, through random selection, for a visa shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected.").  The court in Gomez I recognized as much, observing that there is "no statutory requirement that every available diversity visa be issued each year." Gomez I, 485 F. Supp. 3d at 196. Accordingly, although Congress's inclusion of the September 30 deadline—coupled with its allocation of 55,000 visas to the diversity visa program—indicates Congress's intent that diversity visas be adjudicated expeditiously, it by no means guarantees that all selectees' applications will be processed by that deadline.

*Pushkar*, Attachment A at pg. 17 (concluding that *TRAC* factor 2 was neutral).  The rationale by the *Pushkar* court is persuasive.  It incorporates analysis of other decisions out of the District of Columbia—the district that should be considering all diversity visa litigation in concert.

Moreover, in *Pushkar*, the district court reached a different conclusion on the similar facts, namely the date Plaintiff's visa case number became current and the date Plaintiff became documentarily complere.  In *Filazapovich*, which the Court relied upon for its analysis of the *TRAC* factors, Judge Mehta had consolidated for hearing purposes three distinct cases – *Filazapovich v. Dep't of State*, Civ. A. No. 21-00943, *Goh v. Blinken*, and Goodluck *v. Biden*, Civ. A. No. 21-01530.  Relevant here, Judge Mehta did not grant relief for the *Filazapovich* plaintiffs because they failed to establish standing.  *See Filazapovich v. Dep't of State*, Civ. A. No. 21-00943 (APM), 2021 WL 4127726, at *2 (D.D.C. Sept. 9, 2021) ("For the reasons that follow, the court denies the *Filazapovich* Plaintiffs' motion for preliminary

injunction for lack of standing, grants in part and denies in part the *Goh* parties' motions for summary judgment, and grants the *Goodluck* Plaintiffs' motion for preliminary injunction."). To determine standing, Judge Mehta asked the parties to submit supplemental briefing on whether any plaintiff faced a substantial risk and, *inter alia*, focused on two important facts about each plaintiff: (1) the date the applicant was documentarily qualified; and (2) the date the applicant visa case number became current. For the *Filizapovich* plaintiffs, Judge Mehta noted that "[t]hese four Plaintiffs were not documentarily qualified for most of the 2021 Fiscal Year, and the court cannot conclude that Defendants' delays—and not the Plaintiffs' own delays in becoming documentarily qualified—account for the lack of progress on their visa applications." *Id.* at *11; *see id.* ("These Plaintiffs only recently became documentarily qualified. According to Defendants, Filazapovich's case was not documentarily qualified until June 7, 2021; Zinkovich's case was not documentarily qualified until June 29, 2021; Dudaru's case was not documentarily qualified until May 7, 2021; and Rossa's case is still not documentarily qualified."). For the *Goh* plaintiffs, Judge Mehta found standing because the plaintiff was documentarily qualified on August 28, 2020, and his visa number became current on November 1, 2020, *id.* at *10, and for the *Goodluck* plaintiffs, Judge Mehta found standing because the plaintiff was documentarily qualified on September 4, 2020, and his visa case number became current on October 1, 2020, *id.* at *10.

In turn, Judge Mehta analyzed the *Goh* and *Goodluck* plaintiffs unreasonable delay claims based on the individual circumstances of the plaintiffs who has established standing—applicants whose visa case was current early in the fiscal year. Thus, the Court's reliance on *Filazapovich* must be viewed in this context. In looking at the recent decision by Judge Kollar-Kotelly in *Pushkar*, she focused on the date plaintiff's visa case became current, to determine that the *TRAC* factors did not favor the plaintiff, and thus, the plaintiff did not established a likelihood of success on the merits. *Pushkar*, Attachment A at pg. 20 ("Notably, Plaintiff's visa rank became 'current' as of June 1, 2021."). As Defendants noted in the evidence presented to the Court, Plaintiff's visa case became current on June 1, 2021, and, Plaintiff was not documentarily qualified. Therefore, the Court should instead rely on Judge Kollar-Kotelly's analysis and not Judge Mehta's analysis to determine whether the Court should grant the extraordinary remedy sought here.

Because Kassem does not have standing to challenge the adjudication of the Nasser family's visa, and because the Court with venue over diversity visa cases has reached a contrary conclusion, the United States respectfully asks this Court to consider granting this application for reconsideration and either dismissing this action in its totality or transfer venue to the United States District Court for the District of Columbia.  The United States is aware of the timing of the order to interview in the Court's grant of a preliminary injunction and is preparing to comply with that order if necessary, but nevertheless urges reconsideration on the basis of the new decisions from the District of Columbia.


DATED: September 26, 2021                    Respectfully submitted,

                                             PHILLIP A. TALBERT
                                             Acting United States Attorney
                                             */s/ Audrey B. Hemesath*
                                             AUDREY B. HEMESATH
                                             Assistant United States Attorney

                                             Attorneys for Defendants

# ATTACHMENT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LIUDMYLA PUSHKAR,

      Plaintiff,

    v.

ANTONY BLINKEN, *et al.*,

      Defendants.

Civil Action No. 21-2297 (CKK)

## MEMORANDUM OPINION
(September 23, 2021)

Plaintiff Liudmyla Pushkar is a selectee of the Diversity Visa Lottery for the 2021 fiscal year.  By statute, her eligibility to receive a diversity visa expires on September 30, 2021.  Plaintiff has not received an appointment for a consular interview, one of several prerequisites to obtaining a diversity visa.  In light of the fast-approaching September 30, 2021 deadline, Plaintiff filed an [11] Emergency Motion for a Temporary Restraining ("TRO").  Therein, Plaintiff requests an order compelling Defendants Secretary of State Antony Blinken and Secretary of Homeland Security Alejandro J. Mayorkas ("Defendants") to "schedule" her visa interview and "issue" her immigrant visa before September 30, 2021.  In response to Plaintiff's TRO Motion, Defendants filed a consolidated opposition and motion to dismiss, contending that Plaintiff's Complaint fails to state a claim for relief.

Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court will **DENY** Plaintiff's [2] Motion for a Temporary Restraining Order and will

---

[1] The Court's consideration has focused on the following:

- Plaintiff's Memorandum in Support of Plaintiff's Emergency Motion for Temporary Restraining Order ("Pl.'s TRO Mot."), ECF No. 11;
- Defendants' Memorandum of Points and Authorities in Support of Defendants' Cross-Motion to Dismiss and Opposition to Plaintiff's Motion for TRO ("Defs.' Opp'n"), ECF Nos. 17, 18; and

**HOLD IN ABEYANCE** Defendant's Motion to Dismiss until briefing is completed in accordance with the schedule set forth in the accompanying Order.

## I.    BACKGROUND

### A.  The Diversity Visa Program

Under the Immigration and Nationality Act ("INA"), "Congress has provided for up to 55,000 immigrant diversity visas to be distributed each fiscal year to foreign nationals that hail from countries with historically low levels of immigration to the United States." *Filazapovich v. Dep't of State*, No. 21-cv-943 (APM), 2021 WL 4127726, at *2 (D.D.C. Sept. 9, 2021) (citing 8 U.S.C. §§ 1151(e), 1153(c)).  "Millions of hopefuls enter a lottery for the chance to apply for one of the 55,000 allotted diversity visas."  *Id.*  (citing *Gomez v. Trump* (*"Gomez I"*), 485 F. Supp. 3d 145, 159 (D.D.C. 2020)).    The winners of the lottery "submit an application and various documents to be eligible for a visa number," which can be used only during the fiscal year for which the selectee applied.  *Almaqrami v. Pompeo*, 933 F.3d 774, 776–77 (D.C. Cir. 2019).

Once the selectee is assigned a visa number, he or she must submit required documents to the Kentucky Consular Center ("KCC").  *See* 9 FAM 502.6-4(d)(1).  The KCC then reviews the submitted materials for completion, and, upon deeming the applicant "documentarily qualified," schedules an interview at a local consular office for the applicant when [her] regional lottery rank number is "about to become current." 9 FAM 502.6-4(d)(2); *see also* 8 U.S.C. § 1202(b) ("All immigrant visa applications shall be reviewed and adjudicated by a consular officer.").  A visa interview is scheduled "only if the visa number for the applicant's country, region, and rank order is current per the information in the [State Department's] Visa Bulletin."  *Gjoci v. Dep't of State*,

---

▪  Reply in Support of Plaintiff's Emergency Motion for TRO ("Pl.'s Reply"), ECF No. 19.
In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision.  *See* LCvR 7(f).

Case No. 1:21-cv-00294-RCL, 2021 WL 3912143, at *2 (D.D.C. Sept. 1, 2021); *see also* FAM

502.6-4(d)(2).  "And the availability of interview appointments may depend on the available

resources and competing demands of consulates in an applicant's country of residence." *Gjoci*,

2021 WL 3912143, at *2.  Interviews for lottery selectees are "scheduled in order of their rank

number." *Id.*; *see also* Defs.' Opp'n Ex. B, Declaration of Morgan Miles ("Miles Decl.") ¶ 6, ECF

No. 17-2 ("KCC uses the rank number . . . to determine the order in which cases are eligible to be

scheduled for appointments."); *id.* ("[Diversity visa] selectees with a low rank order, as reflected

in their case number, are more likely to get the opportunity to interview, while those with higher

numbers are less likely to be scheduled.").  Thereafter, "if [s]he meets the criteria to obtain one,

the State Department 'shall' issue [her] a diversity visa." *Almaqrami*, 933 F.3d at 777 (quoting 8

U.S.C. § 1153(c)).

"If the selectee does not receive a visa by the end of the fiscal year, however, [s]he is out

of luck[.]" *Gomez I*, 485 F. Supp. 3d at 159.  "Because the diversity visa program restarts each

fiscal year, consular officers may not issue diversity visas after midnight on September 30 of the

[fiscal year]." *Almaqrami*, 933 F.3d at 777.

Demand for diversity visas "regularly outstrips supply." *Gomez I*, 485 F. Supp. 3d at 159

(noting, for example, that "in Fiscal Year 2018, there were 14.7 million qualified entries"); *see

also P.K. v. Tillerson*, 302 F. Supp. 3d 1, 3 (D.D.C. 2017) ("Millions of people enter the lottery

every year.").  "Those selected for the [diversity visa] program are not guaranteed a visa—only

the opportunity to apply for one." *P.K.*, 302 F. Supp. 3d at 3.

According to Defendants, 71,817 people were selected from the Fiscal Year 2021 Diversity

Visa ("DV-2021") lottery, accounting for 137,969 diversity visa applicants (including selectees'

spouses and children) seeking one of 54,850 available visas.  Defs.' Opp'n at 10; Miles Decl. ¶ 4.

**B. Diversity Visa Processing During COVID-19 Pandemic**

Neither Plaintiff's TRO Motion nor her Complaint raises any specific claim contesting Defendants' policies with respect to processing diversity visa petitions during the COVID-19 pandemic.  Nonetheless, the Court shall provide a brief summary of the policies relevant to the processing of applications for DV-2021 selectees.[2]

Beginning in March 2020, the State Department suspended routine visa processing services due to the COVID-19 pandemic, limiting embassies and consulates to processing visa cases deemed "emergency" or "mission critical."  Defs.' Opp'n Ex. A, Declaration of Francis Chris Lanning ("Lanning Decl.") ¶ 2, ECF No. 17-1.  Diversity visas were excluded from these definitions.  *Id.*

In April 2020, then-President Donald J. Trump issued Presidential Proclamation 10014, which temporarily suspended the entry of immigrants into the United States pursuant to 8 U.S.C. § 1182(f) and 8 U.S.C. § 1185(a).[3]  85 Fed. Reg. 23,441 (Apr. 27, 2021).  This suspension was subsequently extended through March 31, 2021 by Presidential Proclamation 10052, 85 Fed. Reg. 38,263, 38,263–67 (June 25, 2020) and Presidential Proclamation 10131, 86 Fed. Reg. 417, 418 (Dec. 31, 2020).  Although these Proclamations provided certain exceptions in "the national interest" to the general suspension of immigrant entry, there was "no specific national interest exceptions available for diversity visa applicants[.]"  *Gomez I*, 485 F. Supp. 3d at 162.

The State Department interpreted these proclamations and associated guidance as "suspend[ing] not only entry but also the issuance of visas . . . not subject to one of the enumerated

---

[2] More extensive discussions of the facts underlying the processing of diversity visas during FY2020 and FY2021 can be found in, *e.g.*, *Filazapovich*, 2021 WL 4127726, at *2–5; *Gjoci*, 2021 WL 3912143, at *1–5, and *Gomez I*, 485 F. Supp. 3d at 160–64.

[3] Defendants note that Presidential Proclamation 10014 never applied to Plaintiff in this case because it was rescinded in February 2021, before her visa number became "current" in June 2021.  *See* Defs.' Opp'n at 8.  Plaintiff does not dispute this point.

exceptions." *Id*. Accordingly, following the issuance of Presidential Proclamation 10014, the State Department instructed consular posts that they could adjudicate immigrant visas only "for applicants that [the] post believes may meet an exception to the [Presidential Proclamation], including the national interest exception, and that constitute a mission critical category." *Filazapovich*, 2021 WL 4127726, at *3.

On July 8, 2020, the State Department issued guidance that created a "phased approach" to the "resumption of routine visa services," which "laid out visa-processing priorities across three phases of resumed services." *Id*. Under this three-phase approach, diversity visas could not be processed until a consular post reached "Phase Three," and even then, the consular post could process visas only for selectees eligible for an exception under Proclamation 10014. *See id.*

The State Department issued new visa-processing guidance in November 2020, indicating that although its earlier July 2020 guidance "provides important context and structure," consular posts "are no longer obligated to be in a specific . . . phase to adjudicate a particular visa class as described in prior guidance." *Id*. The November 2020 guidance nonetheless "defaulted to a tiered and hierarchical approach that 'closely resembled" the earlier guidance. *Id.* (internal quotation marks and citation omitted). Pursuant to the November 2020 guidance, "[d]iversity visa processing . . . remained relegated to the lowest priority tier." *Id*. Defendants indicate that the November 2020 guidance "prioritized the processing of immediate relative and certain special immigrant visa cases" based on the State Department's "assessment of competing interests" including its "longstanding policy of facilitating family reunification[.]" Defs.' Opp'n at 5.

On February 19, 2021—after the transition of presidential administrations—the State Department issued revised guidance on "Scheduling and Prioritizing Immigrant Visas and Diversity Visa Cases." Lanning Decl. Ex. 2, ECF No. 17-4. Anticipating "the upcoming

expiration" of Proclamation 10014," the February 2021 guidance instructed the "[National Visa Center], KCC, and consular sections worldwide [to] begin scheduling . . . DV-2021 cases currently subject to [Proclamation] 10014 for appointments starting in April 2021." *Filazapovich*, 2021 WL 4127726, at *4. The guidance "incorporated the tiered prioritization framework announced in November 2020" and emphasized that "[visa-]processing posts should continue to maximize their resources to schedule as many family-based [visa] and fiancé [visa] appointments as possible, focusing on reducing any Immediate Relative (IR) visa backlog each month, as resources allow." *Id.* But posts with "immediate relative backlogs" were instructed to "schedule some . . . Diversity Visa (DV) cases each month considering the backlog, if any, for each type of case[.]" *Id.*

On February 24, 2021, President Joseph R. Biden issued Proclamation 10149, which revoked Proclamation 10014 and the portions of Proclamations 10052 and 10131 that had extended the "entry ban" to diversity visa holders. *See* 86 Fed. Reg. 11,847 (Feb. 24, 2021).

Defendants indicate that KCC began processing DV-2021 applications in June 2020. Defs.' Opp'n at 6; Miles Decl. ¶ 8. From March 1, 2021 through September 2, 2021, consular officers adjudicated "at least" 11,370 DV-2021 applications. Defs.' Opp'n Ex. C, Declaration of Laura Stein ("Stein Decl.") ¶ 4, ECF No. 17-3. As of September 17, 2021, KCC has scheduled "at least 10,439 interviews, comprised of 21,092 applicants." Miles Decl. ¶ 13.

Defendants also note that processing for DV-2021 applicants is "principally concentrated in approximately 30 consular posts." Miles Decl. ¶ 14. Of the 71,817 DV-2021 selectees, 54,874 (76%) are assigned to these 30 high-volume DV processing posts, including in Kyiv, Ukraine. *Id.* Moreover, Defendants indicate that the ongoing COVID-19 pandemic has "caused a significant decline in visa processing capacity at the 30 posts that historically process the highest number of

DV applications." Stein Decl. ¶ 5. According to Defendants, the ongoing pandemic "has had a significant operational impact on the Embassy in Kyiv," which only increased its "staffing to 50 percent" as of February 20201. Defs.' Opp'n at 7.

Defendants' processing of diversity visa petitions during the 2020 and 2021 fiscal years has been the subject of extensive litigation in this jurisdiction. Pertinent to DV-2021 selectees, on September 9, 2021, Judge Amit Mehta granted DV-2021 selectees a preliminary injunction, ordering the Department of State to "undertake good-faith efforts . . . to expeditiously process and adjudicate DV-2021 applications and derivative beneficiary applications by September 30, 2021."[4] *Filazapovich*, 2021 WL 4127726, at *26. Defendants in this case indicate that this relief "extends to all [DV-2021] selectees, including Plaintiff [in this case]." Defs.' Opp'n at 2.

## C. Factual Background

Plaintiff Liudmyla Pushkar is a native, citizen, and resident of Ukraine who was selected in the DV-2021 lottery. Compl. ¶ 15, ECF No. 1. Plaintiff filed her immigrant visa application on June 20, 2020. *Id.* ¶ 16. Defendants indicate that Plaintiff's visa number became "current" as of June 1, 2021. Defs.' Opp'n at 2; Miles Decl. ¶ 16. To date, Plaintiff has not received an appointment for an interview at the consular office in Kyiv, Ukraine. Pl.'s TRO Mot. at 4.

Plaintiff filed her Complaint in this action on June 22, 2021. *See* Compl. Originally filed in the United States District Court for the Northern District of Illinois, the case was transferred to this Court on August 31, 2021 by consent of the parties in light of other pending matters in this jurisdiction related to the processing of diversity visas. *See* Stip., ECF No. 7; ECF No. 10.

---

[4] Plaintiff mischaracterizes the relief granted by Judge Mehta, stating that he ordered Defendants to "process and adjudicate *all* DVs prior to September 30, 2021." Pl.'s Reply at 4. Judge Mehta's order plainly did not require Defendants to process "all" DV-2021 applications; rather, as quoted here, it required Defendants to "undertake good-faith efforts" to "expeditiously process and adjudicate DV-2021 applications . . . by September 30, 2021." *Filazapovich*, 2021 WL 4127726, at *26.

In her Complaint, Plaintiff alleges that Defendants have unlawfully withheld and unreasonably delayed the adjudication of her visa petition under the Mandamus Act, 28 U.S.C. § 1361, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 555(b).  *Id.* ¶¶ 2–10.  She seeks an order compelling Defendants to "perform their duty or duties to adjudicate the immigrant visa application."  *Id.* at 6 ¶ (B).

On September 13, 2021, Plaintiff filed an [11] Emergency Motion for Temporary Restraining Order ("TRO Motion"), in which she seeks an order compelling Defendants to "schedule her immigrant visa interview[.]"  Pl.'s TRO Mot. at 4.  Plaintiff contends that Defendants' "refusal" to "schedule and issue her immigrant visa' will "result in Plaintiff's inability to immigrate to the United States through the diversity visa program," given the expiration of her eligibility for a diversity visa as of September 30, 2021.  *Id.* at 6.  The Court set a briefing schedule on Plaintiff's TRO Motion during a teleconference with the parties on September 14, 2021.  *See* Minute Order (Sept. 14, 2021).

On September 20, 2021, Defendants filed their consolidated opposition and motion to dismiss Plaintiff's Complaint.  Plaintiff filed her reply in support of her TRO Motion on September 21, 2021.  Plaintiff did not respond to Defendants' Motion to Dismiss, but requested additional time to submit a response.  *See* Pl.'s Reply at 7.  The Court has set a briefing schedule on Defendants' Motion to Dismiss in the Order accompanying this Memorandum Opinion.

## II.    LEGAL STANDARD

A temporary restraining order "is an extraordinary remedy that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion."  *Postal Police Officers Ass'n v. United States Postal Serv.*, 502 F. Supp. 3d 411, 418 (D.D.C. 2020) (quoting *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004)).  An application for a TRO is

analyzed using the same factors applicable to a request for preliminary injunctive relief.  *See, e.g.,*

*Gordon v. Holder*, 632 F.3d 722, 723–24 (D.C. Cir. 2011) (applying preliminary injunction

standard to district court decision denying motion for TRO and preliminary injunction); *Sibley v.*

*Obama*, 810 F. Supp. 2d 309, 310 (D.D.C. 2011) (articulating TRO elements based on preliminary

injunction case law).

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon

a clear showing that the plaintiff is entitled to such relief."  *Sherley v. Sebelius*, 644 F.3d 388, 392

(D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also*

*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) ("[A] preliminary injunction is an

extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear

showing, carries the burden of persuasion." (internal quotation marks omitted)).   A plaintiff

seeking preliminary injunctive relief "must establish [1] that he is likely to succeed on the merits,

[2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the

balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Aamer v.*

*Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d at 392 (internal

quotation marks omitted)).   When seeking such relief, "the movant has the burden to show that all

four factors, taken together, weigh in favor of the injunction."  *Abdullah v. Obama*, 753 F.3d 193,

197 (D.C. Cir. 2014) (quoting *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C.

Cir. 2009)) (internal quotation marks omitted).  "The four factors have typically been evaluated on

a 'sliding scale.'"  *Davis*, 571 F.3d at 1291.  Under this sliding-scale framework, "[i]f the movant

makes an unusually strong showing on one of the factors, then it does not necessarily have to make

as strong a showing on another factor."  *Id.* at 1291–92.

It is unclear whether the United States Court of Appeals for the District of Columbia Circuit's ("D.C. Circuit") sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter*. *See Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015). Several judges on the D.C. Circuit have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring)). However, the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis. *See id.*; *see also Save Jobs USA*, 105 F. Supp. 3d at 112. In light of this ambiguity, the Court shall consider each of the preliminary injunction factors and shall only evaluate the proper weight to accord the likelihood of success if the Court finds that its relative weight would affect the outcome.

## III.   DISCUSSION

For the reasons set forth below, the Court concludes that Plaintiff has not carried her burden of demonstrating a likelihood of success on the merits, a certainty of irreparable harm, or that the balance of the equities and the public interest tilt in her favor. Accordingly, the Court will **DENY** Plaintiff's emergency motion for a temporary restraining order.

### A.  Likelihood of Success on the Merits

First, in order to receive a TRO, the moving "party must show, among other things, 'a substantial likelihood of success on the merits.'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1308 (D.C. Cir. 2009)). The D.C. Circuit has identified a "likelihood of success on the merits" as the "most important factor" for courts to consider when contemplating a motion for preliminary injunctive relief. *Aamer*, 742 F.3d at 1038.

Plaintiff argues that Defendants have unreasonably delayed and unlawfully withheld adjudication of her visa application, in violation of section 706(1) of the APA and the Mandamus Act. *See* Pl.'s TRO Mot. at 6–7. For the reasons set forth below, the Court concludes that Plaintiff has failed to demonstrate a substantial likelihood of success as to the claims raised in her TRO Motion.

### 1. Unreasonably Delayed

Plaintiff first claims that Defendants have unreasonably delayed processing her visa application, including by not scheduling a consular interview. Pl.'s TRO Mot. at 6–7. The APA requires that agencies "within a reasonable time . . . shall proceed to conclude a matter presented to it." 5 U.S.C. § 555(b). If agencies fail to do so, courts may "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1).

To determine whether Plaintiff is likely to succeed on her claim that Defendants' adjudication of her diversity visa application is "unreasonably delayed," the Court applies the six factors laid out by the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") in *Telecommunications Research & Action Center v. FCC* ("*TRAC*"), 750 F.2d 70, 80 (D.C. Cir. 1984):

> (1) the time agencies take to make decisions must be governed by a rule of reason;
>
> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;
>
> (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;
>
> (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

(5)   the court should also take into account the nature and extent of the
      interests prejudiced by delay; and

(6)   the court need not find any impropriety lurking behind agency
      lassitude in order to hold that agency action is unreasonably delayed.

*In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999) (quoting *TRAC*,
750 F.2d at 80) (internal quotation marks omitted); *see also Skalka v. Kelly*, 246 F. Supp. 3d 147,
152 (D.D.C. 2017) (applying *TRAC* factors to claim for mandamus relief).   Whether a delay is
unreasonable "cannot be decided in the abstract, by reference to some number of months or years
beyond which agency inaction is presumed to be unlawful, but will depend in large part . . . upon
the complexity of the task at hand, the significance (and permanence) of the outcome, and the
resources available to the agency."   *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, 336 F.3d
1094, 1102 (D.C. Cir. 2003).

         a.   *TRAC* Factor 4

         The D.C. Circuit has emphasized the "importance of competing priorities in assessing the
reasonableness of an administrative delay."   *Id.* at 1100 (internal quotation marks omitted).   It
therefore has refused to grant relief—even where all other *TRAC* factors favored relief— where "a
judicial order putting [the petitioner] at the head of the queue [would] simply move[ ] all others
back one space and produce[ ] no net gain."   *In re Barr Laboratories, Inc.*, 930 F.2d 72, 75 (D.C.
Cir. 1991); *see also Xiaobing Liu v. Blinken*, --- F. Supp. 3d ---, 2021 WL 2514692, at *7 (D.D.C.
June 18, 2021) ("This factor not only favors Defendants, but ends up altogether dooming Plaintiffs'
claims of unreasonable delay.").

         That is precisely the effect of Plaintiff's request for relief in her TRO Motion.   She seeks
an emergency order compelling Defendants to "schedule a visa interview."   Pl.'s TRO Mot. at 11.
The practical effect of such an order would allow Plaintiff to proceed to the front of the queue of
other similarly-situated diversity visa applicants—and applicants for other visa categories—who

have not yet received an interview appointment.  *See Verma v. USCIS*, Civil Action No. 20-3419 (RDM), 2020 WL 7495286, at *9 (D.D.C. Dec. 18, 2020) ("To grant Plaintiff priority would push those individuals further back in line when the only difference between them is that plaintiff has brought a federal lawsuit." (internal quotation marks and citations omitted)).  Courts in this jurisdiction routinely decline to grant relief that would place one prospective visa applicant ahead of others.  *See, e.g.*, *Xiaobing Liu*, 2021 WL 2514692, at *7; *Desai v. USCIS*, No. 20-cv-1005 (CKK), 2021 WL 1110737, at *7 (D.D.C. Mar. 22, 2021); *Verma*, 2020 WL 7495286, at *9.

Defendants contend that granting Plaintiff the relief she seeks in her TRO motion would "move [Plaintiff's] case to the front of the line and cause further delay for other applicants awaiting visa determinations."  Defs.' Opp'n at 24.  In other words, expediting review of Plaintiff's application would "merely direct government resources" from the adjudication of other visa applications."  *Ghadami v. Dep't of Homeland Sec.*, No. 19-00397, 2020 WL 1308376, at *9 (D.D.C. Mar. 19, 2020).  Any such order would plainly interfere with the agency's "unique—and authoritative—position to view its projects as a whole, estimate the prospects for each, and allocate its resources in the optimal way."  *In re Barr*, 930 F.2d at 76.

Plaintiff responds that, as of September 20, 2021, there are only 13 DV-2021 cases (representing 28 applicants) assigned to the Kyiv consulate.  *See* Pl.'s Reply at 6 (citing Miles Decl. ¶ 19).  Plaintiff argues that "Defendants do not provide evidence why . . . they are unable to schedule Plaintiff's interview prior to September 30, 2021, if she is only 1 of 13 cases remaining." *Id.*  Plaintiff fails to address however, that the Government has also submitted that there are "1,209 documentarily qualified cases assigned to Kyiv in *other* immigrant visa categories . . . that are awaiting interview slots."  Miles Decl. ¶ 20 (emphasis added).

13

Defendants also provide examples of the health and safety measures adopted at consulates due to the COVID-19 pandemic as an additional "competing priority." *See, e.g.,* Defs.' Opp'n at 3–4, 7, 26–27 ("Unquestionably, the processing timeline for noncitizen Plaintiff's visa case has been delayed further due to measures necessary to prevent the spread of COVID-19 and protect the safety of U.S. officials—and visa applicants—abroad."). Defendants indicate that the "COVID-19 pandemic has had a major impact on Ukraine and on entities operating in Kyiv, including the consular section[.]" Defs.' Opp'n at 7; *see also* Lanning Decl. ¶¶ 4–5, 7; Defs.' Opp'n Ex. D, Declaration of Neal Vermillion ("Vermillion Decl.") ¶¶ 4, 17.

In her Reply, Plaintiff cites Judge Mehta's recent opinion granting preliminary injunctive relief to DV-2021 selectees. *See* Pl.'s Reply at 5. In that case, Judge Mehta concluded that "[r]egardless of the [State] Department's competing priorities," including COVID-19 strictures, "it was plainly unreasonable for it to stop processing visas for five months of FY 2021 based on an erroneous interpretation of the law." *Filazapovich*, 2021 WL 4127726, at *18. But in this case, Plaintiff has raised no challenge to the policies halting visa processing, nor has she provided any evidence or argument that her particular visa was affected by this delay.[5] Notably, Plaintiff's visa rank became "current" as of June 1, 2021, Miles Decl. ¶ 16, several months after she contends the Kyiv consulate resumed processing DV-2021 applications on April 1, 2021, *see* Pl.'s Reply at 6.

As this factor weighs heavily in favor of Defendants, Plaintiff is not likely to show likelihood of success on the merits as to the fourth *TRAC* factor.

---

[5] At least one court has concluded that plaintiffs challenging the "lingering effects" of the policies suspending diversity visa adjudication at the beginning of the 2021 fiscal year lack standing to challenge those policies, as processing of DV-2021 applications has now resumed. *See Gjoci*, 2021 WL 3912143, at *12–13.

b. _TRAC_ Factors 1 and 2

The first and second _TRAC_ factors require the Court to consider whether a "rule of reason" governs the time agencies take to make decisions and whether a "statutory timeline" supplies content for the "rule of reason" inquiry. _TRAC_, 750 F.2d at 80. Courts "typically consider [the first and second factors] together." _Milligan v. Pompeo_, 502 F. Supp. 3d 302, 317–18 (D.D.C. 2020).

Plaintiff has not demonstrated a substantial likelihood that the first factor weighs in her favor. "Whether the State Department has a 'rule of reason' 'cannot be decided in the abstract, by reference to some number of months or years beyond which agency inaction is presumed to be unlawful, but will depend in large part . . . upon the complexity of the task at hand, the significance (and permanence) of the outcome, and the resources available to the agency.'" _Id._ (quoting _Mashpee_, 336 F.3d at 1102). Plaintiff presents no argument in her TRO Motion that Defendants' timing in processing her diversity visa is not guided by a "rule of reason." Rather, based upon the record before the Court at this early procedural juncture, Plaintiff's visa number did not become "current" until June 1, 2021, Miles Decl. ¶ 16—at which point she became eligible for an interview. Defendants have explained that the order in which diversity visa petitions are adjudicated turns on, among other things, the priority number of the particular applicant, whether she was "documentarily qualified," and the conditions at the consulate where the selectee's application would be processed. _See_ Miles Decl. ¶¶ 6, 7; Defs.' Opp'n at 9–11; _see also Gjoci_, 2021 WL 3912143, at *13. Defendants further detail limitations on visa-processing across all types of visas due to the COVID-19 pandemic, including at the Kyiv consulate. _See, e.g._, Defs.' Opp'n at 7; Lanning Decl. ¶ 7. Plaintiff has provided no contrary arguments or facts to suggest that Defendants' alleged "delay" in processing her visa application is contrary to a rule a reason.

15

Plaintiff contends that she is likely to succeed with respect to the second *TRAC* factor because the INA's September 30 deadline for issuing diversity visa demonstrates Congress's intent that the State Department undertake "good-faith efforts" to ensure that "diversity visas are processed and issues before the deadline." Pl.'s TRO Mot. at 8. Other courts in this jurisdiction have concluded that the INA "provides a clear indication of the speed with which it expects the agency to proceed in processing diversity lottery selectees' visa applications, which supplies content for the *TRAC* rule of reason." *Gomez I*, 485 F. Supp. 3d at 196 (internal quotation marks and citations omitted); *see also Filazapovich*, 2021 WL 4127726, at \*18. The court in *Gomez I* reasoned that § 1154 "sets an absolute, unyielding deadline by which selectees must receive their visas: 'Aliens who qualify, through random selection, for a visa under section 1153(c) of this title shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected.'" 485 F. Supp. 3d at 196 (quoting 8 U.S.C. § 1154(a)(1)(I)(ii)(II)).

As in *Gomez I*, Defendants here argue that this provision does not expressly require the State Department to conclude processing diversity visas by that date; it speaks only to the time period during which selectees are eligible to obtain a visa (upon completion of all necessary prerequisites). *See* Defs.' Opp'n at 20–21; *Gomez I*, 485 F. Supp. 3d at 196. But the court in *Gomez I* pointed out that the *TRAC* factor 2 inquiry may be satisfied not only by "an express timetable," but instead by "any other indication [ ] of speed." *Gomez I*, 485 F. Supp. 3d at 196 (citing *TRAC*, 750 F.2d at 80). The *Gomez I* court concluded that "'[t]he specificity and relative brevity' of the September 30 deadline manifests Congress's intent that the State Department undertake good-faith efforts to ensure that diversity visas are processed and issued before the deadline." *Id.* (quoting *In re People's Mojahedin Org. of Iran*, 680 F.3d 832, 837 (D.C. Cir. 2012)).

Although the Court agrees with the rationale articulated in *Gomez I* that the September 30 deadline to issue diversity visas indicates the "speed" at which Congress intended these visas to be processed, the INA does not impose any obligation on Defendants to process *all* diversity visas by the end of the fiscal year.  *See* 8 U.S.C. 1154(a)(1)(I)(ii)(II) ("[A]liens who qualify, through random selection, for a visa shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected.").  The court in *Gomez I* recognized as much, observing that there is "no statutory requirement that every available diversity visa be issued each year."  *Gomez I*, 485 F. Supp. 3d at 196.  Accordingly, although Congress's inclusion of the September 30 deadline—coupled with its allocation of 55,000 visas to the diversity visa program—indicates Congress's intent that diversity visas be adjudicated expeditiously, it by no means guarantees that all selectees' applications will be processed by that deadline.

In sum, Plaintiff has not demonstrated that she is likely to succeed on the merits of her unreasonable delay claim as to the first *TRAC* factor.  The second *TRAC* factor is a closer call; Congress has conveyed its intent that a certain number of diversity visa applications be processed by the end of the fiscal year.  However, there is plainly no statutory obligation requiring *all* visa applications to be processed, much less Plaintiff's particular petition.  Rather, the uncontroverted evidence on the present record indicates that the number of selectees for FY2021 far exceeds the number of available diversity visas. *See* Miles Decl. ¶ 4. The Court finds that, at most, the second *TRAC* factor is evenly balanced between the two parties.

c.   TRAC Factors 3 and 5

The third and fifth factors are often considered together, and require the Court to consider the "nature and extent of interests prejudiced by delay" and whether "human health and welfare are at stake."  *TRAC*, 750 F.3d at 80.

Plaintiff may succeed on the merits of the fifth *TRAC* factor—that she will be prejudiced by the failure to have a consular interview scheduled, which would jeopardize her ability to obtain a visa application by September 30.  *If* Defendants fail to schedule an interview and fail to process her visa by September 30 (that date has not yet passed), she would lose her opportunity to immigrate to the United States through this fiscal year's diversity visa program.  *See* Pl.'s TRO Mot. at 8.

Plaintiff has not demonstrated, however, that the third *TRAC* factor weighs in her favor. To be sure, Plaintiff indicates that her "health and welfare" are at stake because, without an interview, she cannot obtain a visa, which would deprive her of the opportunity to immigrate to the United States based on her status as a DV-2021 selectee, and would prolong her separation from her daughter, who resides in the United States.  *See* Pl.'s TRO Mot. a 9.  However, as noted above, an order compelling Defendants to schedule Plaintiff's interview would merely move Plaintiff to the front of the queue—to the "detriment of other immigrant visa applications, to include family-based visa immigrant applicants, who may have experienced the same or worse impacts from a delay."  Defs.' Opp'n at 26; *see also Mohammed v. Blinken*, 20-cv-3696 (TNM), 2021 WL 2866058, at *6 (D.D.C. July 8, 2021) ("[T]he Court is also mindful that 'many others' face similarly difficult circumstances as they await adjudication of their visa applications.").

Although Plaintiff has demonstrated that she will be prejudiced by Defendants' failure to process her visa application, the Court is not persuaded that she has demonstrated that she is likely to succeed on the merits with respect to the consideration of "human health and welfare"—because it is not just her "health and welfare" that the Court must consider, but also that of others similarly-situated.

    d.  <u>TRAC Factor 6</u>

The sixth *TRAC* factor notes that the "Court need not find any impropriety lurking behind agency lassitude in order to hold the agency action is unreasonably delayed." *Ghadami*, 2020 WL 1308376, at *9. Plaintiff here makes no argument of any agency "impropriety." Accordingly, the Court makes no finding with respect to the sixth *TRAC* factor.

***

In sum, Plaintiff has not demonstrated a likelihood of success on the merits of her unreasonable delay claim. Although Plaintiff may succeed in showing that Congress has indicated the "speed" by which it intended a specified number of diversity visas to be processed and that she will be prejudiced if she fails to receive a visa by September 30, 2021, she has failed to carry her burden of demonstrating a substantial likelihood of success as to the remaining factors. Most notably, the TRO she seeks would interfere with Defendants' allocation of resources and ability to assess competing priorities (including the processing of thousands of visa applications) by moving her particular application to the front of the line. It would also affect other visa applicants, by potentially moving back their position in the queue. Plaintiff has not demonstrated a likelihood of success that the *TRAC* factors favor her, warranting relief under the APA or the Mandamus Act.

    **2.  Unlawfully Withheld**

Plaintiff also contends that Defendants have "violated the APA and Mandamus Act" by "failing to issue the immigrant visa to Plaintiff[.]" Pl.'s TRO Mot. at 7. The Court finds that Plaintiff has failed to demonstrate a likelihood of success on the merits of her claim that Defendants "unlawfully withheld" action on her visa petition.

The APA authorizes courts to "compel agency action unlawfully withheld[.]" *Id.* § 706(1). Section 706(1) "empowers a court to compel an agency to perform a ministerial or non-discretionary act, or to take action upon a matter, without directing *how* it shall act." *Norton v. S.*

19

*Utah Wilderness Alliance*, 542 U.S. 55, 62 (2004) (internal citations and quotation marks omitted).

Similarly, mandamus relief cannot be used to "compel or control a duty in the discharge of which

by law [a federal officer] is given discretion" and is only appropriate where the defendant official

owes the petitioner a clear and nondiscretionary duty.  *Work v. United States ex rel. Rives*, 267

U.S. 175, 177–78 (1925); *see also Heckler v. Ringer,* 466 U.S. 602, 616 (1984).  Mandamus relief

is a "drastic and extraordinary remedy" that is "only to be reserved for extraordinary situations."

*Cheney v. U.S. Dist. Court for D.C.*, 542 U.S. 367, 380 (2004).

Defendants argue that Plaintiff "cannot point to a nondiscretionary duty to act on her visa

case within a certain timeframe, and Plaintiff has no legal entitlement to the adjudication of her

visa case within a certain timeframe."  Defs.' Opp'n at 17 (citing *In re Cheney*, 406 F.3d 723, 729

(D.C. Cir. 2005) ("[I]f there is no clear and compelling duty under the statute as interpreted, the

[Court] must dismiss the action.")).   In response, Plaintiff contends that the INA imposes a

mandatory duty to "process diversity visas"—citing both the statute's allotment of 55,000 visas to

the diversity visa program and Judge Mehta's conclusion that 8 U.S.C. § 1202(b) "imposes a

mandatory duty on consular officers to review and adjudicate immigrant visa applications."  Pl.'s

Reply at 4 (quoting *Filazapovich*, 2021 WL 4127726, *at 17); *see* § 1202(b) ("All immigrant vis

applications shall be reviewed and adjudicated by a consular officer.").

Plaintiff, however, misses an important distinction between this case and *Filazapovich*.

The court in *Filazapovich* held that 8 U.S.C. § 1202(b) "imposes a nondiscretionary duty on

Defendants to adjudicate diversity visas[.]"  But the plaintiffs in *Filazapovich* challenged not only

Defendants' failure to adjudicate their individual visa petitions, but also the Executive policies

writ large that halted all diversity visa processing at the beginning of FY2021.  *See Filazapovich*,

2021 WL 4127726; *supra* Section I(B).   Plaintiff here makes no such challenge, and it is

undisputed that Defendants resumed processing visa petitions before Plaintiff filed her Complaint in this action and before her visa became "current" as of June 1, 2021.  Moreover, as Defendants note, the court in *Filazapovich* did not conclude that any particular visa applicant has the right to have his or her diversity visa adjudicated before September 30.  *Filazapovich* 2021 WL 4127726, at *24 ("[I]t is true that Plaintiffs are not guaranteed to have their diversity visa applications adjudicated.").  Plaintiff cites no authority supporting her contention that Defendants have a non-discretionary, mandatory duty to schedule *her* consular interview within a particular timeframe to allow her visa to be fully processed by the fiscal year deadline.

Plaintiff also cites 22 C.F.R. § 42.81(a) in support of the proposition that consular officers have a "mandatory duty" to "issue a decision on a visa application."  Pl.'s Reply at 4.  But that provision does not compel Defendants to schedule a consular interview, nor does it obligate them to act within a specified timeframe.  Rather, that regulation requires consular officers to grant or refuse a visa "*[w]hen a visa application has been properly completed and executed before a consular officer*[.]"  22 C.F.R. § 42.81(a) (emphasis added).  It not clear from the present record that Plaintiff has satisfied that prerequisite as she has not yet obtained a consular interview.

Plaintiff has failed to demonstrate a likelihood of success on the merits of her claim that Defendants have unreasonably withheld a mandatory, non-discretionary duty with respect to her visa petition.

****

For the reason set forth above, based upon the present record at this preliminary stage of litigation, Plaintiff has not demonstrated that she is likely to succeed on the merits of her APA or Mandamus Act claims challenging Defendants' alleged unreasonably delayed and unlawfully withheld adjudication of her diversity visa petition.

## B.  Irreparable Harm

The Court next considers whether Plaintiff has demonstrated "irreparable harm." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).  To constitute "irreparable harm," the injury alleged must be "both certain and great, actual and not theoretical, beyond remediation, and of such imminence that there is a clear and present need for equitable relief." *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quotation omitted).  And "[p]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis in original) (internal citations omitted).  "[P]ossibility of irreparable harm" is not enough. *Id.*  "[P]roving 'irreparable' injury is a considerable burden, requiring proof that the movant's injury is 'certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm.'" *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Here, Plaintiff argues that if her "visa is not issued by September 30, 2021," she will "permanently lose her opportunity to immigrate to the United States through the diversity visa program." Pl.'s TRO Mot. at 9.  This lost opportunity, she contends, will "cause a prolonged and indefinite period of separation between Plaintiff and her daughter, who resides in the United States." *Id.*

But having an interview "scheduled"—as Plaintiff seeks in her TRO Motion—would not address the "irreparable harm" Plaintiff claims; her visa application would still need to be approved or denied.  *See Almaqrami*, 933 F.3d at 777 ("*[I]f [s]he meets the criteria to obtain one,* the State Department shall issue [her] a diversity visa.").  Plaintiff's TRO Motion relies on the flawed

premise that, by being selected in the diversity visa lottery and submitting the required documents, she is guaranteed a visa. Not so. She was instead guaranteed the opportunity to *apply* for one of approximately 55,000 available visas—as were the other 71,817 lottery selectees for fiscal year 2021. Based on this flawed premise, Plaintiff seeks a TRO compelling Defendants to "schedule" her consular interview and thereafter "issue" her immigrant visa. "Because an injunction will not redress [her] alleged injuries, [plaintiff's] claim that [she] will suffer irreparable harm in the absence of a preliminary injunction is tenuous at best." *Sierra Club v. Dep't of Energy*, 825 F. Supp. 2d 142, 153 (D.D.C. 2011) (quoting *Navistar, Inc. v. EPA*, 2011 WL 3743732, at *3 (D.D.C. Aug. 25, 2011)). Accordingly, the Court finds that Plaintiff has not carried her burden of establishing certain irreparable harm, absent the specific injunctive relief she seeks from this Court.

## C. Balance of Harms and Public Interest

"The final two factors the Court must consider when deciding whether to grant a [temporary restraining order] are the balance of harms and the public interest." *Sierra Club v. United States Army Corps of Engineers*, 990 F. Supp. 2d 9, 41 (D.D.C. 2013). Where, as here, the government is a party to the litigation, these two factors merge and are "one and the same, because the government's interest is the public interest." *Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016). "Although allowing challenged conduct to persist certainly may be harmful to a plaintiff and the public, harm can also flow from enjoining an activity, and the public may benefit most from permitting it to continue." *Sierra Club*, 990 F. Supp. 2d at 41. Therefore, when "balanc[ing] the competing claims of injury," the Court must "consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.

23

Plaintiff first argues that "neither Defendants nor the public has any valid interest in keeping Plaintiff out of the country[.]" Pl.'s TRO Mot. at 6.  But this argument, again, rests on the flawed assumption that she is entitled to a *visa*.  As previously detailed, she must complete a number of required steps (including an interview) before she is eligible to receive a visa.  She has not argued that there is any "public interest" in granting *her* an interview, as opposed to any other diversity visa applicant or any other immigrant visa applicant presently seeking an interview.  Moreover, the ultimate decision of whether to grant or deny Plaintiff a visa rests within the discretion of the Executive branch.  *See Saavedra Bruno v. Albright*, 197 F.3d 1153, 1162 (D.C. Cir. 1999).

Plaintiff next contends any "temporary impact" on Defendants' visa processing resulting from granting her TRO is "insubstantial," whereas she faces "real and irreparable injuries." Pl.'s TRO Mot. at 10–11.  Although the Court recognizes that Plaintiff may lose her opportunity to immigrate to the United States based on her selection in the 2021 fiscal year lottery if her consular interview is not scheduled with sufficient time to grant her a visa, it is not persuaded that this tips the balance of harms and the public interest in her favor.  Granting Plaintiff's requested relief would require Defendants to re-order their processing queue, potentially allowing Plaintiff to move ahead of other similar-situated visa applicants—who, in turn, may lose their opportunity to obtain a visa.  The Court reiterates that the number of applicants eligible for a diversity visa for the 2021 fiscal far exceeds the number of available visas.  *See* Miles Decl. ¶ 4.  As previously noted, being selected in the diversity visa lottery *does* not guarantee applicants the right to obtain a visa.

Overall, the Court finds that Plaintiff has not demonstrated that the balance of the harms and the public interest weigh in favor of her requested TRO.

## IV.    CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court concludes that Plaintiff has failed to satisfy her burden of demonstrating a likelihood of success on the merits, a certainty of irreparable harm, or that the balance of hardships and the public interest weigh in her favor. Accordingly, the Court will **DENY** Plaintiff's [11] Emergency Motion for a Temporary Restraining Order.

An appropriate Order accompanies this Memorandum Opinion.

**Dated**: September 23, 2021

_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge
